## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| REACH AIR MEDICAL SERVICES LLC, CALSTAR AIR MEDICAL SERVICES, LLC, and GUARDIAN FLIGHT LLC, §§§§§§§ | |
| Plaintiffs, §§ | |
| v. § | CIVIL ACTION NO._____ |
| KAISER FOUNDATION HEALTH PLAN INC. and MEDICAL EVALUATORS OF TEXAS ASO, LLC, §§ | |
| Defendants. | |

## ORIGINAL COMPLAINT

Plaintiffs REACH Air Medical Services LLC ("REACH"), CALSTAR Air Medical Services, LLC, and Guardian Flight LLC ("Guardian") (together, "Plaintiffs") file this Original Complaint against Defendants Kaiser Foundation Health Plan Inc. ("Kaiser") and Medical Evaluators of Texas ASO, LLC ("MET") and would respectfully show the Court as follows:

## INTRODUCTION

1. REACH, CALSTAR, and Guardian file this case to vacate six separate Independent Dispute Resolution ("IDR") determinations made by federal contractor MET pursuant to the No Surprises Act ("NSA"), which ruled

in Kaiser's favor on six air ambulance transports provided by Plaintiffs in early 2022. These awards were secured through undue means and misrepresentations on Kaiser's part. In particular, Kaiser either conceals its purported qualifying payment amount ("QPA") on claims or reports different QPAs to Plaintiffs from the ones it reports in the IDR process. This games the system, often making Kaiser's rate falsely appear to be above its QPA. The system is further gamed when a MET reviewer applies an illegal presumption in favor of the false and/or concealed QPA.

2.     The NSA took effect on January 1, 2022. It is implemented and enforced by the combined efforts of the U.S. Departments of Labor, Health and Human Services, and the Treasury (the "Departments"), which together issued interim and then final rules to create an unprecedented, mandatory federal arbitration process to determine pricing for all out-of-network ("OON") emergency air ambulance transports of patients who are covered by commercial insurance. As part of that federal arbitration process, the Departments created a list of only thirteen approved IDR entities (two of which are no longer accepting new disputes).[1] There is virtually no information available to disputing parties to evaluate the competency or quality of the IDR entities. Under the NSA, the IDR entity's decision is binding on the parties

---

[1] https://www.cms.gov/nosurprises/help-resolve-payment-disputes/certified-idre-list

unless there has been a misrepresentation of fact to the IDR entity or it meets the requirements to be vacated under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a).

3.     This case centers on the appropriate payment amounts for six emergency air transports provided by Plaintiffs.  The transports concerned high-acuity patients being taken to facilities to obtain better care or from the scenes of life-threatening accidents.  In each of the six emergency situations, Plaintiffs answered the call, flying the patients on helicopters and fixed-wing aircraft specially configured for medical transport, providing continuous medical care by a crew of specially trained medical professionals.  The emergent nature and medical necessity of these transports were never at issue – only the price to be paid for each transport.

4.     These patients were insured and/or had health plans administered by Kaiser, with which Plaintiffs are OON.  Kaiser allowed differing rates for the transports.  Sometimes, Kaiser would represent to Plaintiffs that the amount allowed on the Explanation of Benefits ("EOB") was its QPA.  Other times, Kaiser would conceal the QPA and fail to make statutorily required disclosures, paying whatever it desired on the claim.

5.     IDR entities like MET have numerous employees who individually review and adjudicate each claim.  While MET has in many instances delivered considered, thoughtful decisions while administering IDR disputes, it has been

3

taken in by Kaiser's bad faith scheme to minimize payment on air ambulance claims. Kaiser's bad faith conduct has been further exacerbated by an unidentified individual at MET who applies an illegal presumption in deciding appropriate payment amounts.

6.     In each case, Kaiser conceals from Plaintiffs in the IDR process the details on how its purported QPA is calculated. On claims where it discloses its purported QPA, Kaiser submits to MET *a different, lower amount* that it claims to *also be* its QPA for the claim. This alleged QPA submitted to MET is always materially lower than the QPA reported to Plaintiffs and/or the amount paid on the claim. MET is thereby misled into believing that Kaiser had offered in the IDR proceeding to pay *more* than its QPA on the claim. Plaintiffs likewise were duped into basing IDR offers and their briefing on the amounts listed on Kaiser EOBs. An anonymous person at MET then reviewed the parties' submissions and applied an illegal presumption in favor of the purported QPA, thereby violating the NSA and rewarding Kaiser for its bad faith scheme and multiple violations of federal law.

7.     The only way Plaintiffs learned of Kaiser's scheme was when the MET reviewer, in its payment determination, revealed that Kaiser had submitted a purported QPA in its briefing. In particular, on claims where Kaiser had submitted different QPAs to Plaintiffs than the ones they had provided to MET, the MET reviewer stated that "[t]he qualifying payment

amount ("QPA") ***has not been agreed upon*** by the parties." It then listed the QPA being claimed by Kaiser, revealing for the first time that Kaiser was conducting a bad faith scheme using multiple purported QPAs.

8.      Plaintiffs hereby seek to vacate these awards and for the Court to enter an order directing rehearings with due process protections.

## PARTIES

9.      Plaintiff REACH Air Medical Services LLC ("REACH") is a California limited liability company that provides air ambulance services in multiple states.

10.     Plaintiff CALSTAR Air Medical Services, LLC ("CALSTAR") is a California limited liability company that provides air ambulance services in states around the country, including California.

11.     Plaintiff Guardian Flight, LLC is a Delaware limited liability company that provides air ambulance services in states around the country, including Nebraska and Texas.

12.     Defendant Kaiser is a California corporation providing prepaid comprehensive medical, surgical and hospital services to voluntarily enrolled members. Kaiser is registered to do business in Texas, maintains a registered agent in Texas, and provides coverage for emergencies in Texas, thereby properly subjecting it to suit there. Kaiser also made misrepresentations and

material omissions by its submission to MET in Houston, Texas, which damaged Plaintiffs.

13.     Defendant MET is a Texas limited liability company that is headquartered in Houston, Texas.

## VENUE AND JURISDICTION

14.     The NSA creates a right to judicial review of awards issued in IDR proceedings. See 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). Venue is proper under 28 U.S.C. § 1391(b) because 1) both defendants reside in Texas and at least one resides in this judicial district, and 2) a substantial part of the events giving rise to the claim also occurred in this district.  This is also the district in which the award was made.  See 9 U.S.C. § 10(a).

15.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1331, the NSA and its implementing regulations, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2201, because this matter requires the Court to interpret and apply the NSA and its implementing regulations, and because 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) expressly authorizes judicial review under the circumstances at issue herein.

## FACTUAL BACKGROUND

16.     The air ambulance industry plays an integral role in the American healthcare system.  Air ambulances often serve as the only lifeline connecting critically ill and injured patients to healthcare, particularly in rural areas.

They transport trauma, stroke, heart attack, and burn patients and other emergent cases requiring critical care.  Without air ambulances, more than 85 million Americans would not be able to reach a Level 1 or 2 trauma center within an hour when emergency care is needed.  The delivery of on-demand, life-saving air ambulance services in emergencies requires substantial investments in specialized aircraft, air bases, technology,  personnel, and regulatory compliance systems.

17.    On January 17, 2022, an adult suffered a stroke while on the treadmill (the "Stroke Claim," DISP-27514).  The patient was taken to a Kaiser hospital, where doctors found evidence of intracranial bleeding, Guardian provided critical emergency air transport, moving the patient from that hospital to a specialty Kaiser location that was equipped to provide a higher level of neurology care.

18.    On February 6, 2022, a child fell from a ski lift, breaking a leg (the "Ski Lift Claim," DISP-27486).  The child was flown seventy miles by a specialty transport team experienced in pediatric intensive care in a helicopter specially equipped for the journey.

19.    That same day, an adult suffered serious injuries, including fractured ribs, from a rollover accident on an all-terrain vehicle (the "ATV Claim," DISP-29872).  The patient was provided critical emergency air transport from one hospital to another that provided a higher level of care.

20.     Also on February 6, 2022, an adult was injured on a motorcross dirt bike in a remote part of a canyon (the "Motorcross Claim," DISP-27490). The patient was picked up at the bottom of the canyon and transported seventy-seven miles by air to a Kaiser hospital for emergency care.

21.     And on February 8, 2022, an elderly patient was driving a tractor when it rolled over on its side, severely injuring the patient (the "Tractor Claim," DISP-29936). The patient was provided an emergency air transport to a Kaiser hospital for treatment.

22.     Finally, on February 22, 2022, a patient suffered a brain hemorrhage and was transported by ground to a hospital not equipped to provide the neurosurgical services needed (the "Hemorrhage Claim," DISP-32104). The patient was then transported by air two hundred and eight miles to a facility where the needed surgery was available.

23.     In each of these six cases, Plaintiffs answered the call, transporting the patients on either medically equipped helicopters or fixed-wing aircraft, and providing continuous medical care throughout the trips.

**The No Surprises Act and Federal Independent Dispute Resolution Proceedings.**

24.     The NSA became effective January 1, 2022. There are sections of the NSA that are unique to air ambulance transports because air ambulance transports are covered by the Airline Deregulation Act and are not subject to

8

state rate regulation.  Broadly speaking, the NSA requires patient cost-sharing for emergency OON claims to be the same as for in-network claims.  That said, insurers are allowed to initially pay to the OON provider whatever amount they deem appropriate (or nothing at all).  If they make an OON payment that is too low, a provider must first attempt to negotiate a higher one.   If negotiations fail, a provider must submit the dispute to the IDR process.  During this process, the IDR entity (a federal contractor), without a hearing, must select one of the two offers submitted based on the position statements submitted by the parties.

25.    The Departments created a list of only thirteen approved IDR arbitration entities (two of which is no longer accepting new disputes).  There is no meaningful information available to the parties to evaluate the competency or quality of the various IDR entities.  No information is provided about the specific qualifications of the employees of the IDR entities who will actually decide the appropriate OON rate for a transport.

26.    The award is made without a hearing or exchange of written submissions between the parties.  Accordingly, neither party is allowed the opportunity to respond to the other's submission.  The way the Departments have implemented the No Surprises Act results in a black-box approach where payors can make misrepresentations in their submissions that skew IDR outcomes with impunity.  Judicial review of IDR proceedings is therefore

essential to ensure that providers like Plaintiffs receive due process and are not subject to bad faith schemes and unlawful decision making.

27.     Plaintiffs and their affiliates have prevailed in a substantial majority of the disputes decided through the IDR process, including many favorable decisions by MET.  Many of the reasoned awards, including awards from MET, explain how the credible evidence submitted supports the OON payment requested.  However, it appears that an errant MET reviewer is not following the law and instead applies an illegal standard.

28.     The NSA requires arbitrators to consider certain categories of information in determining the appropriate OON rate.  *See* 42 U.S.C. § 300gg-112(b)(5)(C) (Considerations in determination).[2]  The QPA is only one such piece of information.  *Id.* at § 300gg-112(b)(5)(C)(i).  The QPA is defined in the NSA as the "median of the contracted rates recognized by the plan or issuer" "for the same or a similar item or service" offered in the same insurance market and in the same geographic region as of January 31, 2019, increased by the consumer price index.  *Id.* at § 300gg-111(a)(3)(I)(i).  By regulation, a health plan can calculate its QPA using only rates it has "contractually agreed to pay a . . . provider of air ambulance services for covered items or services," expressly

---

[2] The No Surprises Act amended the Internal Revenue Code, the Employee Retirement Income Security Act (ERISA), and the Public Health Service Act (PHS Act).  All three statutory amendments are substantively identical.  Accordingly, for sake of brevity, citations to NSA requirements are to the PHS Act, 42 U.S.C. 300gg et seq.).

excluding any "single case agreement, letter of agreement, or other similar arrangement . . . for a specific participant or beneficiary in unique circumstances" as "not constitu[ting] a contract." 45 C.F.R 149.140(a)(1).[3] If a plan or issuer does not have at least three in-network contracts for a service, the QPA may be determined based on information from a third-party database. *Id.* § 149.140(c)(3)(i).

29.    The NSA enumerates additional information that must be considered:

- the quality and outcomes measurements of the provider that furnished the services;

- the acuity of the individual receiving the services or the complexity of furnishing such services to such individual;

- the training, experience, and quality of the medical personnel that furnished the services;

- ambulance vehicle type, including the clinical capability level of such vehicle;

- population density of the pick up location (such as urban, suburban, rural, or frontier); and
- demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or the plan or

---

[3] The regulations regarding how the QPA may be calculated are currently being litigated by the air ambulance industry. *See, e.g., Assoc. of Air Medical Servs. v. U.S. Dept. of Health and Human Servs. et al.*, Case No. 1:21-cv-3031 in the United States District Court for the District of Columbia (filed 11/16/21).

> issuer to enter into network agreements and, if applicable,
> contracted rates between the provider and the plan or issuer,
> as applicable, during the previous 4 plan years.

42 U.S.C. § 300gg-112(b)(5)(C)(ii).  Furthermore, the IDR entity must consider

any further information related to an offer and submitted by a party.  *Id.* at §

300gg-112(b)(5)(B)(ii).

**The Illegal Presumption in Favor of the QPA.**

30.    The Departments originally jointly published an Interim Rule that

compelled IDR entities to apply a rebuttable presumption that the QPA was

the appropriate OON rate.  Arbitrators were required to select the offer closest

to the QPA unless a provider overcame the presumption with credible evidence.

This "thumb on the scale" approach was held illegal in litigation filed by the

Texas Medical Association ("TMA") on behalf of physicians and facilities.  *See*

*Tex. Med. Ass'n v. United States Dep't of Health & Human Servs.*, No. 6:21-cv-

425-JDK, 2022 WL 542879 at *15 (E.D. Tex. Feb. 23, 2022).  Subsequently, in

a related lawsuit, the same federal court invalidated the Departments' illegal

presumption as it applied to air ambulance transports.  *See Lifenet Inc. v. U.S.*

*Dept. of Health & Human Servs., et al.*, No. 6:22-cv-00162-JDK, 2022 WL

2959715 at *10 (E.D. Tex., June 26, 2022) (vacating final sentence of 45 C.F.R.

§ 149.520(b)(2) requiring additional information submitted by parties

"demonstrate that the qualifying payment amount is materially different from

the appropriate out-of-network rate").

31.     The claims at issue herein were decided between September 29, 2022 and October 5, 2022, each more than three months after the illegal presumption in favor of the QPA was invalidated.  Accordingly, MET was required to consider all of the facts and circumstances of the payment dispute and select the offer that best represented the value of the air ambulance services provided to Kaiser's member.  The QPA was merely one data point, and should have had little relevance to this analysis, especially if Kaiser failed to provide any evidence to show how its QPA was calculated or how it specifically related to the transport at issue.[4]

32.     The Final Rule, issued after the IDR decision at issue herein was made, did not adopt the QPA presumption from the Interim Rule.  The Final Rule states that "IDR entities should select the offer that best represents the value of the item or service under dispute after considering the QPA and all permissible information submitted by the parties." 87 Fed. Reg. 52,618 (August 26, 2022) at 52,628.

**Kaiser Pays Each Claim at "Allowed" Rates.**

33.     By regulation, insurers are required to include with each initial payment or denial the insurer's QPA for each item or service involved.  *See* 45

---

[4]  For example, QPAs may be based on contracts with air ambulance companies that could not possibly have performed the transport under consideration.  Similarly QPAs based on agreements with small, urban fleets owned and operated by a hospital bear little relevance to the appropriate rate for a rural transport by an independent air ambulance company that has invested in the bases, fleet and infrastructure needed to perform such transports.

C.F.R. § 149.140(d)(1)(i).   Insurers must also certify that each QPA was determined in compliance with federal requirements.  *Id.* § 149.140(d)(1)(ii)(A)-(B).

34.    As the Departments have explained:

The Departments seek to ensure ***transparent and meaningful disclosure*** about the calculation of the QPA while minimizing administrative burdens on plans and issuers. These interim final rules therefore ***require that plans and issuers make certain disclosures with each initial payment*** or notice of denial of payment, and that plans and issuers ***must provide additional information upon request*** of the provider or facility.

86 Fed. Reg. 36,898 (July 13, 2021) (emphasis added).

35.    Kaiser was also required by regulation to "provide a statement that if the provider or facility, as applicable, wishes to initiate a 30-day open negotiation period for purposes of determining the amount of total payment, the provider or facility may contact the appropriate person or office to initiate open negotiation, and that if the 30-day open negotiation period does not result in a determination, generally, the provider or facility may initiate the IDR process within 4 days after the end of the open negotiation period."  45 C.F.R. § 149.140(d)(1)(iii).   Kaiser was further required to "provide contact information, including a telephone number and email address, for the appropriate office or person to initiate open negotiations for purposes of determining an amount of payment (including cost sharing) for such item or service."  Id.

36.     Kaiser sometimes makes these disclosures and sometimes does not.  On April 18, 2022, it "allowed" $19,186.68 on the Stroke Claim.[5]  It represented that the allowed amount was its QPA for the claim and made the statutory disclosures.

37.     On April 21, 2022, it issued an EOB that included multiple air ambulance claims, "allowing" $34,419.20 on the Ski Lift Claim and $35,473.40 on the Motorcross Claim.  Both claims were coded as "claim paid at allowed amount."  The EOB did not state that these amounts were the QPA, disclose any QPAs, or provide the statutory disclosures.

38.     On April 25, 2022, Kaiser "allowed" $29,148.20 on the Tractor Claim.  This amount was coded as "claim paid at allowed amount."  The EOB did not state that this was the QPA, disclose a QPA, or provide the statutory disclosures.

39.     That same day, Kaiser "allowed" $38,784.96 on the ATV Claim.  This amount was coded as "claim paid at allowed amount."  Kaiser represented on this EOB that the allowed amount was also the QPA and made the required disclosures.

---

[5] The primary components of an air ambulance claim are the base and mileage rates.  While ancillary services may be provided and reimbursed, the allegations in this Complaint concern the combined amounts allowed for base and mileage.

40.    On April 28, 2022, Kaiser "allowed" $22,260.12 on the Hemorrhage Claim.  This amount was coded as "claim paid at allowed amount."  Kaiser represented on this EOB that the amount allowed was its QPA for the claim and made the statutory disclosures.

41.    Because the amounts allowed were far below reasonable market rates for the transports at issue, Plaintiffs initiated an Open Negotiation Period for each dispute.  In each instance, rather than negotiate a reasonable OON rate as contemplated by the NSA, Kaiser adopted a "take-it-or-leave-it" approach.  During the ONPs, Kaiser refused to provide additional information regarding the alleged QPA calculations in response to questions from Plaintiffs.

**Kaiser Submits a Different or Secret QPA to MET, Which Applied the Illegal Presumption In Kaiser's Favor.**

42.    After providing Plaintiffs with purported QPAs on three of these six claims, Kaiser next proceeded to submit to MET *different*, even lower QPAs.  On the three claims where Kaiser did not provide Plaintiffs with a QPA, Kaiser submitted purported QPAs that were substantially lower than the "allowed" amount.  Plaintiffs only learned of this bad faith tactic when MET issued its decisions.  With respect to the three claims where MET submitted different QPAs, MET stated in its decision that the parties had *not agreed* on

the QPA.   Below is  a chart comparting the purported QPAs provided to Plaintiffs in EOBs versus those submitted to MET:

| Claim | QPA submitted to Plaintiffs | QPA submitted to MET |
|---|---|---|
| Stroke (DISP-27514) | $19,186.68 | $7,482.41 |
| ATV (DISP-29872) | $38,536.00 | $18,885.59 |
| Hemorrhage (DISP-32104) | $21,679.48 | $8,687.07 |

Below is a chart comparing the amounts allowed on claims where no QPA was disclosed compared to the purported QPAs submitted by Kaiser to MET.

| Claim | Allowed Amount | QPA submitted to MET |
|---|---|---|
| Tractor (DISP-29936) | $29,148.20 | $13,351.04 |
| Ski Lift (DISP-27486) | $34,419.20 | $16,952.89 |
| Motorcross (DISP-27490) | $35,473.30 | $17,040.74 |

43.   Certain payors are not properly calculating the QPA in accordance with the regulations, a fact the Departments have acknowledged.   For instance, the Departments concede that payors are not properly calculating QPAs for providers in the "same or similar specialty."  DEPTS, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021,*

Implementation Part 55 at pp. 16-17 (Aug. 19, 2022) available at https://perma.cc/B7L7-QEKM. They also concede that payors sometimes calculate the QPA by including contracts that have $0 listed for a service, thereby artificially depressing the QPA. The Departments have stated that this practice is improper. *Id.* at 17 n.29.

44.   All of the purported QPAs submitted by Kaiser to MET for each claim diverge significantly from market data for similar services from 2019. Indeed, so do the higher purported QPAs listed by Kaiser on the EOBs where one was allegedly disclosed.

45.   This is not the first time Kaiser came up with a scheme to underpay providers. For instance, prior to 2020, Kaiser was paying fair rates for air ambulance transports in California. Then, California passed a law prohibiting air ambulances from balance billing patients for amounts not paid by their insurers. In response, Kaiser unilaterally slashed payments overnight by approximately 60%.

46.   In three of the six disputes, MET stated that "[t]he qualifying payment amount ("QPA") has not been agreed upon by the parties," and listed the higher QPA from Plaintiffs' submissions (from the EOB) and the lower amounts from Kaiser's submissions. In each of these instances, MET noted that the amount offered by a Plaintiff was a certain percentage "greater than what Kaiser suggests is the QPA." On the three claims where no QPA was

provided, MET disclosed the purported QPAs that were never provided to Plaintiffs.

47.   On some claims, Kaiser creates two QPAs—one higher that is listed in the EOBs and a much lower one that it submits to MET.  By submitting a lower QPA to MET, Kaiser misled MET into believing it was offering an amount higher than its QPA.  On other claims, Kaiser simply violates federal law and refuses to disclose its purported QPA (which is improbably low) or make the disclosures required by law.

48.   In all of these cases, a MET reviewer received the purported QPAs submitted by Kaiser and applied an illegal presumption in its favor.  In the Ski Lift, Stroke, ATV, Tractor and Hemhorrage Claims, the MET reviewer repeated *verbatim* the following in its determination:

> [Plaintiff]'s submission has been considered carefully.  However, [Plaintiff] has not "***clearly demonstrated*** that the qualifying payment amount is ***materially different*** from the appropriate out-of-network rate."  29 Code of Federal Regulations 2590.716-8(c)(4)(iii)(C).

(emphasis added).   In other words, MET cited and applied the ***exact regulation*** that was invalidated in *TMA* and the standard that was ruled illegal to apply to air ambulance claims in *LifeNet*.[6]  *See Tex. Med. Ass'n*, 2022 WL 542879 at *15 (ordering that "the following provisions of the Rule are VACATED: . . . the final sentence of 29 C.F.R. § 2590.716-8(c)(4)(iii)(C)");

---

[6] In the Motorcross Claim, MET applied and repeated the illegal standard but did not specifically cite the vacated rule.

*Lifenet Inc.*, 2022 WL 2959715 at \*10 (E.D. Tex., June 26, 2022) (vacating the requirement that information submitted by an air ambulance company "demonstrate that the qualifying payment amount is materially different from the appropriate out-of-network rate"). This alone warrants vacatur of these six awards and remand.

49.     Kaiser has developed a scheme to minimize payments on air ambulance transports by misrepresenting the amount of its QPA to providers and IDR entities and/or concealing the QPA from providers in the claims and IDR process, all in violation of federal law. Kaiser furthers the scheme by concealing information essential to understanding what its QPA actually is and how it was calculated. This is all done so no one can question Kaiser's QPA methodology, which often results in two different QPAs, each of which wildly differs from market rates. Kaiser is securing IDR awards through undue means.

### KAISER'S AWARDS SHOULD BE VACATED AND THE DISPUTES RESUBMITTED FOR NEW IDR DETERMINATIONS

50.     The NSA allows a district court to vacate an arbitration award in the following four circumstances:

> (1)     where the award was procured by corruption, fraud, or undue means;
>
> (2)     where there was evident partiality or corruption in the arbitrators, or either of them;

(3)     where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)     where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

42 U.S.C. § 300gg–111 (c)(5)(E)(1) (adopting the standards found at 9 U.S.C. § 10(a)(1)).  In addition, an IDR decision is not binding on a party where there is evidence of misrepresentation of facts presented to an IDR entity regarding the claim, such as an improperly calculated QPA.  *Id.*  All six of the IDR awards in favor of Kaiser at issue in this proceeding should be vacated under all of these grounds.

51.     Kaiser secured the awards at issue through undue means and misrepresentations of fact.  For some of the disputes, Kaiser created two QPAs, submitting the lower one to the IDR entity to create the false impression that it was offering to pay more than its QPA.  At the same time, it reported a higher QPA to Plaintiffs, resulting in Plaintiffs submitting their IDR briefs under false pretenses.  For other disputes, it concealed its purported QPA, denying Plaintiffs the information required under federal law and further gaming the IDR process.  Upon information and belief, none of the multiple QPAs being calculated by Kaiser are being done so accurately or in accordance with federal

law.  These actions were taken in bad faith and to secure an undue advantage in the IDR process.

52.     Also, an individual at MET revealed evident partiality, committed prejudicial misbehavior, and exceeded its powers by using an illegal presumption in favor of the purported QPAs.  As acknowledged in MET's short awards, Kaiser's payment offers prevailed solely because they were the closest to the QPA and/or because of the illegal presumption applied in their favor.  An anonymous person at MET reviewed and applied illegal, vacated rules and selected the offers closest to the purported QPA.

53.     The FAA permits this Court not only to vacate an award but to "direct a rehearing by the arbitrators" so long as the parties' agreement does not preclude it.  9 U.S.C. § 10(b).  Here, there is no agreement between the parties and thus nothing precluding a rehearing.  Furthermore, nothing in the NSA prevents a court from providing appropriate relief such as a rehearing when it vacates an IDR award.  Merely vacating the IDR awards at issue without directing a rehearing in accordance with the proper standards under the NSA would provide Plaintiffs no relief at all, as only a rehearing can result in a higher payment under the new federal regulatory scheme created by the NSA.

54.     This case raises substantial issues of federal law relating to how the QPA may be permissibly calculated under the NSA and its implementing

regulations, the proper interpretation of the NSA with respect to what constitutes a misrepresentation of fact to an IDR entity, the proper interpretation of the NSA with respect to whether IDR awards are enforceable where such misrepresentations of fact have occurred, the proper remedy where a payor submits a different QPA to an IDR entity during the dispute process than it provides a payor during the claims process, and the proper remedy under the NSA and its implementing regulations where a payor has withheld material information from a provider.  It also concerns the due process requirements for review of decisions made by IDR entities, including the relationship between the NSA, which created a compelled process administered by a governmental agency, and the FAA, which governs voluntary agreements made between private parties.

55.    In particular, IDR proceedings are unlike private arbitrations. Plaintiffs did not voluntarily agree to arbitrate the payment disputes at issue. They are required by federal law to participate in IDR proceedings to try to obtain fair compensation for their services.  Plaintiffs did not select and had no input in selecting the individual at MET who actually decided the dispute, who remains anonymous to this day.  And unlike private arbitrations, Plaintiffs were not provided any discovery and did not receive a reasoned award.  Indeed, the awards make no mention of the specific, credible evidence submitted by Plaintiffs in support of a higher payment.

56.     Due process requires more.  Plaintiffs provided critical, life-saving transports and are entitled to fair adjudication of the amounts of their payment.

## REQUEST FOR RELIEF

57.     Plaintiffs request that the Court vacate the arbitration awards at issue and declare that: 1) Kaiser made misrepresentations of fact to MET when it submitted what it represented were its QPAs for the claims; 2) Kaiser procured the IDR awards at issue through misrepresentations and undue means; and 3) by applying an illegal presumption in favor of the QPAs, the MET reviewer revealed evident partiality, committed prejudicial misbehavior, and exceeded its powers, or so imperfectly executed them that mutual, final, and definite awards upon the subject matter submitted were not made.

58.     Plaintiffs further request that the Court direct MET to rehear these claims, to assign a different MET reviewer to them than the one who decided them, to implement new briefing schedules so that Plaintiffs can submit new position statements and new offers, and to assure that Plaintiffs receive due process by rendering reasoned decisions in accordance with the requirements of the NSA upon consideration of all evidence submitted by the parties that relates to an offer, and without a presumption in favor of the QPA.

59.     Plaintiffs further request their attorneys' fees and costs, and any other just and proper relief.

Dated:  November 15, 2022          NORTON ROSE FULBRIGHT US LLP

*/s/ Adam T. Schramek*
Adam T. Schramek, Lead Counsel
Texas Bar No. 24033045
98 San Jacinto Boulevard
Suite 1100
Austin, TX  78701-4255
Telephone:  (512) 474-5201
Facsimile:  (512) 536-4598
adam.schramek@nortonrosefulbright.com

Abraham Chang
Texas Bar No. 24102827
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246
abraham.chang@nortonrosefulbright.com

*Attorneys for Plaintiffs REACH Air
Medical Services LLC, CALSTAR Air
Medical Services, LLC, and Guardian
Flight LLC*